IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 18, 2015 Session

IN RE BENJAMIN A.

Appeal from the Juvenile Court for Hamilton County
No. 258,720    Robert D. Philyaw, Judge

_____

No. E2015-00577-COA-R3-PT-FILED-MARCH 14, 2016
_____

This is a termination of parental rights case, focusing on Benjamin A., the minor child ("the Child") of Brent H. ("Father") and Brandice A. ("Mother"). The Child was taken into protective custody by the Tennessee Department of Children's Services ("DCS") on November 4, 2010, upon investigation of a spiral fracture to his right arm and suspected child abuse. On December 17, 2013, DCS filed a petition to terminate the parental rights of Father. Mother previously had surrendered her parental rights to the Child in June 2013 and is not a party to this appeal. Following a bench trial, the trial court found that statutory grounds existed to terminate the parental rights of Father upon its finding by clear and convincing evidence that Father had (1) abandoned the Child by willfully failing to provide financial support, (2) abandoned the Child by failing to provide a suitable home, and (3) failed to substantially comply with the reasonable responsibilities and requirements of the permanency plans. The court further found by clear and convincing evidence that termination of Father's parental rights was in the Child's best interest. Father has appealed. Having determined that, as DCS concedes, the element of willfulness was not proven by clear and convincing evidence as to Father's failure to support the Child, we reverse the trial court's finding regarding the statutory ground of abandonment through failure to support. We affirm the trial court's judgment in all other respects, including the termination of Father's parental rights to the Child.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed in Part, Reversed in Part; Case Remanded

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and CHARLES D. SUSANO, JR., J., joined.

John Wysong, Chattanooga, Tennessee, for the appellant, Brent H.

Herbert H. Slatery, III, Attorney General and Reporter, and Eugenia Izmaylova, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Kathleen B. Overton, Hixson, Tennessee, Guardian Ad Litem.

**OPINION**

I. Factual and Procedural Background

The incident leading to the Child's removal from the parents' home occurred when the Child was five months old. The parents, who were never married, had been residing together for approximately two years and had cared for the Child since his birth. On November 2, 2010, the parents brought the Child to his primary care doctor with pain and sensitivity in his right arm. The primary care doctor referred the Child to T.C. Thompson Children's Hospital, where he was diagnosed with a mid-right humeral diaphyseal spiral fracture of his right arm. The emergency department physician treating the Child suspected non-accidental origin of the Child's injury. Following investigation of suspected severe child abuse, DCS removed the Child from the parents' care on November 3, 2010.

Upon DCS's petition for temporary custody, the trial court ordered the Child into protective custody on November 4, 2010. DCS alleged in its petition that the Child was dependent and neglected as to both parents and the victim of severe child abuse. Following the Child's release from the hospital, DCS placed the Child in non-relative foster care with D.S. and E.S., a married couple with whom the Child remained throughout the pendency of these proceedings. E.S. testified during the termination proceedings that she and her husband wished to adopt the Child.

Prior to filing the petition for termination of parental rights, DCS developed five permanency plans concerning Father and the Child. DCS presented the plans as exhibits during the termination proceedings. The first permanency plan was established on November 17, 2010, and ratified by the trial court in an order entered June 20, 2011, following a hearing conducted on May 11, 2011. Father indicated by his signature that he had participated in the development of the plan and agreed with it. An unsigned attachment to the plan reflected that Father had received a copy of a form entitled "Criteria & Procedures for Termination of Parental Rights" and that the grounds for termination, including the statutory definition of abandonment, had been reviewed with him. The permanency goal listed on this plan was "Return to Parent." The plan required Father to engage in supervised visitation with the Child, providing supplies for the visit such as diapers and healthy food; obtain a mental health assessment and follow all

2

resultant recommendations; explore the pattern of behavior and issues that led to the Child's injury; maintain financial stability with legal, verifiable income; maintain a safe, stable, and childproofed home; contact TennCare regarding transportation for the Child's appointments; and pay child support as ordered by the court.

Father suffers from Kienbock's Syndrome and rheumatoid arthritis. From the time of the Child's removal through October 2014, he received Supplemental Security Income ("SSI"). Following a hearing conducted on August 23, 2012, at which Father did not appear, the trial court directed Father to pay $308.00 in monthly child support plus $21.67 monthly toward a child support arrearage determined to total $6,468.00. Father testified during the termination proceedings that upon DCS's advice prompting him to earn additional income, he was employed part-time for an unspecified period at a Subway restaurant. He stated that he left that position when the restaurant wanted him to work more hours than his physical condition would allow. DCS presented a child support payment record reflecting that Father made a sole $20.00 payment on February 6, 2014. In October 2014, Father began receiving Social Security Disability Income ("SSDI") in place of SSI.

During the four and one-half years that the Child was in protective custody prior to trial, three DCS case managers successively took primary responsibility for the Child's case during different time periods. Elizabeth Wiltshire handled the case from November 2010 through her resignation from DCS in December 2011, after which Paige Morse[1] assumed responsibility through the date of trial. However, from July 2012 through September 2012, Kim Ash served as an interim case manager while Ms. Morse was on leave. All three of these DCS case managers, former and current, testified at trial.

Ms. Wiltshire testified that while the first permanency plan was in effect, she determined in-home services were needed and referred the case to Pathfinders. Pathfinders Case Manager June Moon testified that from February 2011 through June 2011, she visited the parents once or twice weekly to assist them with concerns regarding environmental safety, including overall cleanliness, hygenic pet care, stocking of appropriate food, and clearing of refuse outside the home. It is undisputed that the parents were caring for six dogs inside the home and one dog primarily in the yard. Ms. Moon stated that the dogs were not well housebroken. She further stated that during the time she worked with the parents, they reduced their pet population to two dogs. Particularly as relevant to Father, Ms. Moon assisted him with parenting skills, house management, money management, and use of community resources. Ms. Moon testified

---

[1] In the trial transcript, Ms. Morse's last name is listed as "Morris." Because her name is spelled "Morse" in permanency plan documents and in orders entered by the trial court, we have adopted that spelling throughout this opinion.

that she reviewed "each step" of the first permanency plan's requirements with Father. She also observed some of the parents' visits with the Child.

According to Ms. Moon, she stopped working with the parents when DCS removed Pathfinders from the case because the parents were relocating but did not yet have new housing. Ms. Moon reported that at the end of her time with the parents, they were working on improving overall cleanliness in the home. She had observed Father during visits employing a few of the parenting techniques she had discussed with him. She noted, however, that refuse around the outside of the home was still a problem. She further stated that when she administered a hair follicle drug screen on Father during this time period, he tested positive for marijuana use. Ms. Moon opined that despite some progress, the parents were not prepared to take care of the Child in their home at the time she stopped working with them.

The second permanency plan was established on July 27, 2011, and ratified by the trial court in an order entered October 10, 2011, following a hearing conducted on August 31, 2011. Father participated in the child and family team meeting during which the plan was developed. This plan set forth alternate permanency goals of "Return to Parent" and "Adoption." Many of the requirements and responsibilities under this second plan remained the same, including that Father was to engage in supervised visitation with the Child, providing supplies for the visits; explore the pattern of behavior and issues that led to the Child's injury; and maintain a safe, stable, and childproofed home. Father also was required in this plan to obtain a parenting assessment and follow all resultant recommendations; complete anger management classes; and undergo an alcohol and drug assessment, following any accompanying recommendations. In addition, DCS expanded Father's responsibility to child-proof the home to include keeping the Child safe from "potentially harmful animals/dog."

Beginning in March 2011, Father completed a six-month parenting assessment, administered by Walter Mickulick, MA, MPA. In a report dated August 23, 2011, Mr. Mickulick recommended that Father keep a daily log of actions taken toward completion of the permanency plan; obtain a consultation with an occupational therapist and occupational training to facilitate safe carrying and transfer of the Child; submit to a "drug challenge test," consisting of ten random drug screens in a sixty-day timeframe; obtain training in auditory stimulation activities for the Child; attend a nurturing parenting course with baby-play activities modeled; obtain short-term, goal-oriented psychotherapy to understand Father's early attachment style; develop a healthy outside social support system; obtain a psychiatric consultation to determine if psychotropic medication were needed; acquire and maintain appropriate housing for a minimum of three months; provide DCS the right to enter the home; and safely and hygienically maintain pets. Ms. Wiltshire testified that Mr. Mickulick's recommendations were

4

subsequently incorporated into Father's permanency plans pursuant to the earlier requirement that he follow all parenting assessment recommendations.

The parents relocated in November 2011 to a duplex rental home on Walden Road in Chattanooga ("Walden Road Duplex"). The property manager for the Walden Road Duplex, Vikram Vashi, testified that Father entered into a lease to rent the duplex on November 1, 2011. He stated that Father paid the required rent for the first two months and then did not pay again. Mr. Vashi filed a detainer notice for nonpayment of rent on March 3, 2012. Father testified that he moved out of the Walden Road Duplex "right before March" 2012 when Mother and he were separating. Mr. Vashi testified that by the time a detainer warrant was filed, Mother and Father had vacated the premises. When asked to describe the Walden Road Duplex after the parents vacated the premises, Mr. Vashi stated: "It was completely ruined, completely ruined. I had to replace carpet. I had to do everything new." He stated that pet feces and rotten food were throughout the home and that it was difficult to breathe inside the home. Father acknowledged that when the Walden Road Duplex was vacated in March 2012, its condition was "nasty," but Father maintained that he had worked to keep the home clean before he moved out.

As to DCS's initial dependency and neglect allegation, the trial court conducted an adjudicatory hearing in 2011 over the course of five days spanning September 29, 2011, to December 21, 2011. Finding that the parents had committed severe child abuse, the court adjudicated the Child dependent and neglected as to both parents in an order entered January 20, 2012. Due to the finding of severe abuse, the court relieved DCS from the obligation of exerting reasonable efforts to reunify the Child with the parents. Father timely appealed the adjudicatory order to the Hamilton County Circuit Court.

While Father's appeal of the severe abuse finding was pending, a third permanency plan was developed on February 14, 2012, and ratified by the trial court following a hearing conducted on May 10, 2012.[2] Again, Father participated in the child and family team meeting at which the third plan was developed. He appeared at the hearing during which the court ratified the plan. In addition to maintaining the requirements of the second permanency plan, the third plan repeated the initial requirement that Father undergo a mental health assessment.

Prior to June 2012, Father participated in regular visitation with the Child. From December 2011 through May 2012, supervised visitation was set on weekends at the home of the Child's paternal grandmother ("Paternal Grandmother"). It is undisputed that in May 2011, Father requested that the parents' visits with the Child be moved to the DCS office following a disagreement between the parents and Paternal Grandmother over

---

[2] The trial court entered an order memorializing its ratification of the third permanency plan on June 26, 2012, subsequent to development of the fourth permanency plan.

plans for the Child's birthday party. Thereafter, the parents visited with the Child at the DCS office with a DCS transporter supervising. Ms. Wiltshire, Ms. Morse, and Ms. Moon each respectively testified to having observed visits between Father and the Child. The case managers' testimony consistently demonstrated that Father participated actively in visitation and behaved appropriately toward the Child during visits.

The fourth permanency plan was developed on May 8, 2012. The signature pages attached to this plan are unsigned by any participants and therefore provide no indication of whether Father participated in the plan's development. This plan continued the requirements of the third permanency plan. In addition, this plan included specific incorporation of the parenting assessment recommendations, stating: "The parents will follow the recommendations of the parenting assessment in order to understand how to safely meet [the Child's] needs." The plan further delineated several of these recommendations as separate requirements, for instance, setting forth that Father would undergo "ten random drug screens within sixty days with two of them back to back" and "keep a daily log" of his accomplishments in complying with the plan.

The trial court magistrate conducted a permanency hearing to review the fourth permanency plan on June 5, 2012. The parents failed to appear at this hearing, although each was represented by counsel. The court ratified the fourth permanency plan and found, *inter alia*, that neither parent was in substantial compliance with the preexisting permanency plans and that the parents' lack of respective progress remained a barrier to resolving the reasons that the Child was in foster care. The court further found that DCS "need[ed] to file a Termination of Parental Rights petition against both parents in order for [the Child] to achieve permanency."

Upon the guardian *ad litem*'s oral motion during the June 5, 2012 hearing, the trial court suspended the parents' visitation with the Child. Regarding the parents' failure to appear at the hearing, the court stated in its written order, entered July 30, 2012:

> Neither parent appeared, despite having notice of today's hearing. Ms. Morse was advised by the mother and father that they had moved and were going to Florida where the father had a job painting. However, [Father] did not know the name of his employer and the parents could not state where they currently lived or where they were going to reside.

Ms. Morse's testimony during the termination proceedings corroborated the trial court's summary of her testimony at this prior hearing. At trial, Ms. Morse also testified that she spoke to the parents a week before the hearing and reminded them of the court date. According to Ms. Morse, the parents informed her that they would be unable to attend because they would be in Florida and that they intended to ask their attorneys to continue

the hearing. No motions of continuance regarding this hearing were filed. When questioned regarding why he believed the court suspended his visitation with the Child in June 2012, Father stated that he believed it was because he had missed a court date and because DCS had heard he intended to move to Florida. According to Father, he only had a tentative temporary employment prospect in Florida and had never relocated there. He insisted that he did not know about the June 5, 2012 court date.

Ms. Ash testified at trial that although she understood that pursuant to the severe abuse finding, the trial court had relieved DCS of the responsibility to exert reasonable efforts to assist the parents, she attempted to visit Father twice and check on his progress during the time that she served as interim case manager from July 2012 to September 2012. She stated that during that time, Father was residing with a friend, K.K., and the friend's four children in an apartment off Walden Road in Chattanooga. Father also testified that he resided with a friend and her children for a few months after moving out of the Walden Road Duplex. According to Ms. Ash, the first time she attempted to visit Father, she did not exit her vehicle because several large dogs were loose in the front yard. The second time she attempted to visit, Ms. Ash was informed by two children that Father was not home. Ms. Ash stated that she subsequently spoke to Father via telephone and reviewed the requirements of the current permanency plan with him "step by step." She also stated that Father told her he was looking for housing and thought it would be better if a DCS case manager did not attempt to visit him until he was in new housing.

It is undisputed that following Ms. Ash's contact with Father in the summer of 2012, Father was not in contact with DCS personnel again until February 2013. Father testified that he "tr[ied] to stay in contact" with DCS and visited the courthouse in person to "try and find out . . . what to do." Ms. Morse testified that on February 14, 2013, Father "show[ed] up" at the DCS office, and she sat down with him "for an extensive amount of time" to review his statement of responsibilities from the permanency plan.

The fifth permanency plan was developed on August 14, 2013, and ratified by the trial court in an order entered December 11, 2013, following a hearing conducted on October 2, 2013. A notation on this plan indicates that Father participated via telephone in the child and family team meeting at which the plan was developed while his counsel participated in person. By the time this plan was developed, Mother had surrendered her parental rights on June 19, 2013. Father's requirements under this plan remained the same as under the fourth permanency plan, including all recommendations made in the parenting assessment.

On November 25, 2013, the Circuit Court entered an "Agreed Order" regarding Father's appeal of the trial court's January 26, 2012 adjudicatory order. Upon the parties' announced agreement, the Circuit Court vacated the trial court's finding of severe child

abuse as to Father while affirming the trial court's finding that the Child was dependent and neglected as to Father. In its Agreed Order, the Circuit Court did not address the trial court's previous provision relieving DCS of the obligation to exert reasonable efforts to assist Father in complying with the permanency plans.

On December 13, 2013, DCS filed a petition to terminate the parental rights of Father, alleging statutory grounds of abandonment through failure to financially support the Child and substantial noncompliance with the permanency plans. On February 18, 2014, the trial court entered orders appointing counsel to represent Father during the termination proceedings and a guardian *ad litem* to represent the Child. On the same date, the trial court magistrate conducted a hearing regarding a petition for custody that previously had been filed by Paternal Grandmother in March 2011.[3] Finding that upon Paternal Grandmother's testimony that Father had been residing with her for some time, the court "would not be inclined to grant custody of the child to a relative with whom the father resides after making a severe abuse finding," the magistrate denied Paternal Grandmother's petition. Paternal Grandmother timely requested a rehearing before the trial court judge.

On April 29, 2014, DCS filed a motion requesting permission to amend its petition to terminate Father's parental rights by adding the alleged statutory grounds of abandonment through failure to provide a suitable home and persistence of the conditions leading to the Child's removal from Father's home. In an order entered June 9, 2014, the trial court granted DCS's motion to amend the petition, setting a dual hearing for the termination proceedings and the rehearing of Paternal Grandmother's petition. On July 21, 2014, the trial court entered an order appointing Father's current counsel to represent Father.

On November 5, 2014, the trial court conducted an evidentiary hearing on Paternal Grandmother's petition to rehear her custody petition. Without objection, the court also heard overlapping testimony relevant to the termination petition. During this hearing, Paternal Grandmother testified that Father resided with her currently and had done so for "a few years." Father subsequently testified that he had resided with Paternal Grandmother since leaving his friend's home in the summer of 2012.

On November 10, 2014, the trial court entered an order confirming the magistrate's findings and recommendations denying Paternal Grandmother's petition. The court specifically found, *inter alia*:

---

[3] Paternal Grandmother's petition is not in the record on appeal.

There were significant gaps in communication between the grandmother and the child and between the grandmother and the child's caregiver and . . . grandmother last saw the child in October 2013. There were also significant practical concerns regarding the residence, and grandmother's ability to physically and emotionally care for the child.

Following two additional days of trial on November 21, 2014, and January 5, 2015, the trial court granted the termination petition upon its finding by clear and convincing evidence that Father had (1) abandoned the Child through willful failure to provide financial support, (2) abandoned the Child through failure to provide a suitable home, and (3) failed to substantially comply with the statements of responsibilities in the permanency plans.[4] The court further found by clear and convincing evidence that termination of Father's parental rights was in the Child's best interest. The court entered a written final judgment to this effect on March 3, 2015. Father timely appealed.

## II. Issues Presented

On appeal, Father presents five issues, which we have restated as follows:

1.      Whether Father's due process rights under the Fourteenth Amendment of the United States Constitution and Article 1, Section 8 of the Tennessee Constitution were violated due to DCS's alleged failure to provide notice to Father of the definition of abandonment pursuant to Tennessee Code Annotated § 37-2-403(a)(2)(A).

2.      Whether the trial court erred by finding clear and convincing evidence of the statutory ground of abandonment by willful failure to support the Child.

3.      Whether the trial court erred by finding clear and convincing evidence of the statutory ground of abandonment through failure to provide a suitable home for the Child.

4.      Whether the trial court erred by finding clear and convincing evidence of the statutory ground of Father's failure to substantially

---

[4] The trial court did not address in its final order DCS's allegation regarding the statutory ground of persistence of conditions leading to removal of the Child from Father's home. Inasmuch as DCS has not raised this alleged ground as an issue on appeal and a finding of clear and convincing evidence of one statutory ground is sufficient to terminate parental rights when found to be in the best interest of the child, we determine that the omission of a finding on persistence of conditions does not affect our analysis of the issues raised on appeal.

comply with the responsibilities and requirements of the permanency plans.

5. Whether the trial court erred by finding clear and convincing evidence that termination of Father's parental rights was in the Child's best interest.

## III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *See In re Carrington H.*, ___ S.W.3d ___, ___, No. M2014-00453-SC-R11-PT, 2016 WL 819593 at *12 (Tenn. Jan. 29, 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, ___ S.W.3d at ___, 2016 WL 819593 at *12 (citing *In re M.L.P.*, 281 S.W.3d 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has recently explained:

The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky,* 455 U.S. at 759 (recognizing that a decison terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981)

(discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

* * *

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, ___ S.W.3d at ___-___, 2016 WL 819593 at *10-12. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard*, 319 S.W.3d at 596.

IV.  Statutory Abandonment

Tennessee Code Annotated § 36-1-113 (Supp. 2015) lists the statutory grounds for termination of parental rights, providing:

(a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c) Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined, *inter alia*, that Father had abandoned the Child by (1) willfully failing to support the Child in the four months immediately preceding the filing of the termination petition and (2) failing to establish a suitable home in the four months following the Child's removal into protective custody. *See* Tenn. Code Ann. § 36-1-113(g)(1).

Tennessee Code Annotated § 36-1-113(g)(1) provides, as relevant to this action:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Tennessee Code Annotated § 36-1-102(1)(A) (Supp. 2015) defines abandonment, in relevant part, as:

(i)     For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

(ii)     The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.  The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department; . . .

A.  Notice to Father of Statutory Abandonment Definition

As a threshold matter, Father contends that his due process rights were violated because DCS failed to provide him with notice of the statutory definition of abandonment pursuant to Tennessee Code Annotated § 37-2-403(a)(2) (2014).  DCS asserts that Father waived his right to raise this issue on appeal because he did not raise it before the trial court.  Upon our careful review of the record, however, we determine that Father expressly raised this issue during his closing argument at trial.  Father's counsel also repeatedly questioned DCS personnel during testimony regarding whether the permanency plans contained the statutory abandonment definition.  We therefore determine that Father has properly raised this issue on appeal.  Upon careful review of the record, we further determine that Father was afforded sufficient notice of the statutory definition of abandonment.

Tennessee Code Annotated § 37-2-403(a)(2) provides in pertinent part:

(A)     The permanency plan for any child in foster care shall include a statement of responsibilities between the parents, the agency and the caseworker of such agency.   Such statements shall include the responsibilities of each party in specific terms and shall be reasonably related to the achievement of the goal specified in subdivision (a)(1).   The statement shall include the definitions of "abandonment of an infant" contained in § 36-1-102 and the criteria and procedures for termination of parental rights.   Each party shall sign the statement and be given a copy of it.   The court must review the proposed plan, make any necessary modifications and ratify or approve the plan within sixty (60) days of the foster care placement. The department of children's services shall, by rules promulgated pursuant to the Uniform Administrative Procedures Act, compiled in title 4, chapter 5, part 2, determine the required elements or contents of the permanency plan.

(B)(i)          The parents or legal guardians of the child shall receive notice to appear at the court review of the permanency plan and the court shall explain on the record the law relating to abandonment contained in § 36-1-102, and shall explain that the consequences of failure to visit or support the child will be termination of the parents' or guardians' rights to the child, and the court will further explain that the parents or guardians may seek an attorney to represent the parents or guardians in any termination proceeding.   If the parents or legal guardians are not at the hearing to review the permanency plan, the court shall explain to the parents or guardians at any subsequent hearing regarding the child held thereafter, that the consequences of failure to visit or support the child will be termination of the parents' or guardians' rights to the child and that they may seek an attorney to represent the parents or guardians in a termination proceeding.

(ii)          If the parents or guardians of the child cannot be given notice to appear at the court review of the permanency plan, or if they refuse or fail to appear at the court review of the permanency plan, or cannot be found to provide notice for the court review of the permanency plan, any agency that holds custody of the child in foster care or in any other type of care

14

and that seeks to terminate parental or guardian rights based upon abandonment of that child under § 36-1-102, shall not be precluded from proceeding with the termination based upon the grounds of abandonment, if the agency demonstrates at the time of the termination proceeding:

(*a*)    That the court record shows, or the petitioning party presents to the court a copy of the permanency plan that shows that the defendant parents or legal guardians, subsequent to the court review in subdivision (a)(2)(B)(i), has signed the portion of the permanency plan that describes the criteria for establishing abandonment under § 36-1-102, or that the court record shows that, at a subsequent hearing regarding the child, the court made the statements to the parents or legal guardians required by subdivision (a)(2)(B)(i);

(*b*)    By an affidavit, that the child's permanency plan containing language that describes the criteria for establishing abandonment under § 36-1-102 was presented by the agency party to the parents or guardians at any time prior to filing the termination petition, or that there was an attempt at any time to present the plan that describes the criteria for establishing abandonment under § 36-1-102 to the parents or guardians at any time by the agency party, and that such attempt was refused by the parents or guardians; and

(*c*) That, if the court record does not contain a signed copy of the permanency plan, or if the petitioning agency cannot present evidence of a permanency plan showing evidence of such notice having been given or an affidavit showing that the plan was given or that the plan was attempted to be given to the parents or guardians by the agency and was refused by the parents or guardians, and, in this circumstance, if there is no other court record of the explanation by the court of the consequences of abandonment and the right to seek an attorney at any time, then the petitioning agency shall file with the court an affidavit in the termination proceeding that describes in detail the party's diligent efforts to bring such notice required by subdivision (a)(2)(B)(i) to such parent or

> guardian at any time prior to filing the agency's filing of the termination petition.

As this Court has explained:

> Tennessee Code Annotated § 37-2-403 establishes requirements for a permanency plan for a child placed in foster care. It also establishes requirements for notice to parents of the definition and potential consequences of "abandonment" as that term is defined in Tenn. Code Ann. § 36-1-102. First, that definition and the potential and procedures for termination of parental rights are to be included on the initial permanency plan itself, which is to be signed by the parent. Tenn. Code Ann. § 37-2-403(a)(2)(A). Second, at the hearing on the court's consideration of the permanency plan, the court "shall explain on the record the law relating to abandonment contained in § 36-1-102." Tenn. Code Ann. § 37-2-403(a)(2)(B)(i). If the parents are not present at the first hearing, the court is to make the required explanation at any subsequent hearings. *Id.*

> *In re J.L.E.,* [No. M2004-02133-COA-R3-PT,] 2005 WL 1541862, at *7 [(Tenn. Ct. App. June 30, 2005)] (footnote omitted)[, *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533 (Tenn. 2015)]. If the parents do not appear at permanency plan hearings or cannot be provided notice of such hearings, DCS may still proceed to terminate parental rights on the ground of abandonment when the child or children have been placed in foster care "under § 36-1-102" *only if* DCS demonstrates specified things at the time of the termination proceeding. *Id.;* Tenn. Code Ann. § 37-2-403(a)(2)(B)(ii).

*In re B.L.C.*, No. M2007-01011-COA-R3-PT, 2007 WL 4322068 at *4 (Tenn. Ct. App. Dec. 6, 2007) (emphasis in original); *see also In re Aiden W.*, No. E2013-01609-COA-R3-PT, 2014 WL 1682903 at *10-11 (Tenn. Ct. App. Apr. 28, 2014).

It is undisputed that Father participated in development of the first permanency plan. Attached to the first plan is the signature page of what appears to be the form entitled "Criteria & Procedures for Termination of Parental Rights." Father acknowledges that his signature appears on this page under the following statement:

16

**I have received a copy of <u>Criteria & Procedures for Termination of Parental Rights</u> and have been given an explanation of its contents.**

Father's signature is dated November 17, 2010, the date the first permanency plan was developed. A family service worker's signature appears under the following statement: "I explained the contents of this document to the father on Nov. 17, 2010." Ms. Wiltshire, the case manager at the time, also signed alongside the space for the family service worker's signature. Ms. Wiltshire confirmed her signature under oath at trial. Although the signature page is intact, the first portion of the form is not attached to the copy of the permanency plan submitted as an exhibit at trial. The second, third, and fifth permanency plans also indicate Father's participation in the child and family team meetings at which the plans were developed, but none of the subsequent plans includes the Criteria & Procedures for Termination of Parental Rights or definition of statutory abandonment.

Father argues that because only the signature page of the Criteria & Procedures for Termination of Parental Rights was included in the first permanency plan as submitted to the trial court, DCS failed to demonstrate that it had provided notice to Father of the statutory definition of abandonment. We disagree. *See In re Ashley E.*, No. M2011-02473-COA-R3-PT, 2012 WL 3027352 at *3 (Tenn. Ct. App. July 24, 2012) ("The fact that the first two pages of the [Criteria & Procedures for Termination of Parental Rights] document [are] not in the record is not dispositive of the issue of notice raised by [the parents]."). We note that this Court has previously determined that the form typically utilized by DCS as "Criteria & Procedures for Termination of Parental Rights" contains a statutory definition of abandonment as a ground for termination of parental rights. *See, e.g., In re Timothy W.H.*, No. M2012-01638-COA-R3-PT, 2012 WL 6115061 at *3 (Tenn. Ct. App. Dec. 7, 2012) ("The criteria [for termination of parental rights] addressed abandonment, lack of concern, substantial noncompliance with the permanency plan, and persistent conditions."); *In re Ashley E.*, 2012 WL 3027352 at *3 (finding that the "criteria and procedures for termination of parental rights" that the parents acknowledged they received in the mail from DCS was "the notice referenced at Tenn. Code Ann. § 37-2-403(a)(2)(A)."); *In re Amber M.S.*, No. M2010-00873-COA-R3-PT, 2010 WL 4941180 at *2 (Tenn. Ct. App. Nov. 30, 2010) ("The package also included a document titled, 'Criteria and Procedures for Termination of Parental Rights,' which explained the criteria and procedures for termination of parental rights and warned Mother of the consequences if she failed to comply with the plans."); *In re C.S., Jr.*, No. M2005-02499-COA-R3-PT, 2006 WL 2644371 at *2 (Tenn. Ct. App. Sept. 14, 2006) ("A second permanency plan for the children was established on August 27, 2004. Mother signed this plan, as well as the criteria and procedures for termination of parental rights, which outlined the circumstances under which Mother's parental rights could be terminated."). In the instant action, Ms. Wiltshire testified that she had participated in development of the initial

17

permanency plan with the family, including Father, and confirmed that she had signed the form on that date, indicating that criteria and procedures for termination of parental rights had been explained to Father.

Father does not specifically contend that the trial court failed at the first permanency hearing to "explain on the record the law relating to abandonment contained in § 36-1-102." *See* Tenn. Code Ann. § 37-2-403(a)(2)(B)(i). As the first plan appears in the record, it consists of eleven pages with "page 1 of 11" attached at the end of pages two through ten. This "page 1" sets forth spaces for "Hearing Attendee[s]" to sign. Father's name is hand-printed in the space provided by "Father" on this form. Adjacent to Father's name is a column asking: "If parents were present, were the grounds for Termination reviewed with them, including the statutory definition of abandonment?" The box by "Yes" in answer to this question is checked by Father's name. Father has provided no transcripts of the permanency hearings. Moreover, the trial court's permanency orders indicate that Father was present for all but the fourth permanency hearing, at which the court found Father to have failed to appear despite having been served with notice. Moreover, Father was represented by his former counsel throughout the dependency and neglect proceedings, including all permanency hearings.

Although Father's current counsel raised the issue of notice during closing argument at trial, the record reflects that at no time did Father object to proceeding with the termination hearing based upon an alleged lack of compliance with the notice requirement of Tennessee Code Annotated § 37-2-403. *See In re Ashley E.*, No. 2012 WL 30227352 at \*3 (determining that despite the absence of initial permanency plan transcripts in the record, the record contained no indication that the court had not complied with the notice requirement, particularly when neither of the parents "articulated any objection or reservation to proceeding with the hearing on termination of their parental rights based on lack of compliance with Tenn. Code Ann. § 37-2-403.").

In support of his argument, Father relies on this Court's decisions in *In re J.L.E.*, 2005 WL 1541862, and *In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618 at \*11 (Tenn. Ct. App. Apr. 29, 2005). We determine these cases to be highly factually distinguishable from the case at bar. In *In re J.L.E.*, this Court reversed the trial court's finding of abandonment upon determining that the record contained no indication that the mother had participated in development of the first two permanency plans or had received an explanation of the criteria for termination until <u>after</u> the termination petition had been filed. *See In re J.L.E.*, 2005 WL 1541862 at \*9 ("Obviously, notifying Mother in February of 2004 that her failure to establish a suitable home by October of 2003 constituted grounds for termination in a petition that had already been filed does not meet the statutory requirement of notice."). As to *In re W.B., IV*, Father is correct that this Court explained the statutory notice requirement applicable when DCS or another child-

placing agency obtains custody of a child upon removal from the parents' home. *See In re W.B., IV*, 2005 WL 1021618 at *11. However, this Court explained the requirement in contrast to the situation at issue, which involved a private petition. *See id.* Father's reliance on these cases is misplaced. Upon our thorough review of the record, we conclude that DCS and the trial court provided Father with adequate notice pursuant to Tennessee Code Annotated § 37-2-403(a)(2)(A)-(B).

### B. Willful Failure to Support

Father does not dispute the trial court's finding that during the four and one-half years prior to trial that the Child was in protective custody, Father made only one $20.00 payment in child support. Child support payment records demonstrated that Father made this payment on February 6, 2014, subsequent to the filing of the termination petition. The court previously had entered an order on August 23, 2012, directing Father to pay $308.00 in monthly child support plus $21.67 monthly toward a child support arrearage of $6,468.00. Father contends, however, that the trial court erred by finding clear and convincing evidence that his nonpayment of support was willful. *See In re Audrey S.*, 182 S.W.3d 838, 863 (Tenn. Ct. App. 2005) ("A parent cannot be found to have abandoned a child under Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either 'willfully' failed to visit or 'willfully' failed to support the child for a period of four consecutive months."). Father argues that because his income during the four-month determinative period was primarily derived from his SSI benefits, the court erred in ordering him to pay child support based on his SSI benefits. On appeal, DCS concedes that the evidence does not clearly and convincingly demonstrate that Father willfully failed to pay child support. DCS therefore has elected not to defend the statutory ground of abandonment through failure to provide financial support for the Child.

The four-month determinative period for purposes of determining abandonment by willful failure to pay support, pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(i), began on August 16, 2013, and concluded on December 16, 2013, the day prior to the filing of the termination petition. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085 at *6 (Tenn. Ct. App. Feb. 20, 2014) (concluding that the applicable four-month statutory period preceding filing of the termination petition ends on the day preceding filing). Father testified, and DCS does not refute, that at the time the Child was removed into protective custody, Father was receiving SSI benefits and continued receiving those benefits until October 2014 when he began receiving SSDI benefits instead. Although Father testified that he worked part-time at a Subway restaurant for an unspecified period of time in 2013, he further testified that he stopped working in that position because of the physical effects of his disability. It is well settled in Tennessee that SSI benefits are not subject to legal process for payment of court-ordered child support. *See Tenn. Dep't of Human Servs., ex rel. Young v. Young*, 802

19

S.W.2d 594, 599 (Tenn. 1990). We therefore agree with the parties that the evidence preponderates against a finding by clear and convincing evidence that Father willfully failed to pay child support during the determinative period. We reverse the trial court's judgment regarding this statutory ground.

## C. Failure to Provide a Suitable Home

The trial court also found that Father had abandoned the Child by failing to provide a suitable home. In its final judgment, the trial court made the following specific findings in relevant part:

> The Court finds clear and convincing evidence that despite the fact that the Department has made reasonable efforts to assist [Father] to establish a suitable home for the child for a period of four (4) months following the removal as well as many months afterward, [Father] has made no reasonable efforts to provide a suitable home and has demonstrated a lack of concern for the child to such a degree that it appears unlikely that he will be able to provide a suitable home for the child at an early date.
>
> Specifically, the Court finds that the Department provided the father with at least one (1) Community Resource list to assist in searching for housing and other resources. The Department provided bus passes and access to a telephone when [Father] needed it. The Department provided services through Pathfinders to assist the family. June Moon with Pathfinders worked with [Father] for a period of six to seven (6-7) months in 2011. Ms. Moon testified that she worked with [Father] on money management, parenting skills, house management, and how to use community resources. Ms. Moon concluded that progress was minimal and [Father's] effort was lacking. Despite these services and assistance, [Father] has never been able to maintain his own stable residence and has failed to complete any task on his permanency plan aimed at assisting him in providing a safe and stable home to which the child could be returned.

Upon a thorough review of the record, we conclude that these findings, made under a clear and convincing evidence standard, are supported by a preponderance of the evidence.

Father contends that the trial court erred by finding clear and convincing evidence of this statutory ground because (1) he continued to reside in the home from which the Child had been removed during the statutorily determinative period; (2) by the time of trial, he had established a suitable home with Paternal Grandmother; and (3) DCS failed

to extend reasonable efforts following the trial court's severe abuse finding despite Father's pending appeal of said finding. We will address each of Father's arguments in turn.

The four-month determinative period for purposes of determining abandonment through failure to provide a suitable home, pursuant to Tennessee Code Annotated § 36-1-102(1)(A)(ii), began with the Child's removal into protective custody on November 4, 2010, and concluded on March 4, 2011. *See, e.g., In re Gabriel B.*, No. E2013-01581-COA-R3-PT, 2014 WL 1272201 at *6 (Tenn. Ct. App. Mar. 28, 2014). During this period, Father was indeed residing in a home with Mother. However, according to Ms. Moon's testimony, the home was not suitable for the Child when Ms. Moon began working with the parents in February 2011, nor were the parents prepared to care for the Child safely in the home when she stopped providing weekly assistance in June 2011.

Ms. Wiltshire testified that she provided Father with a list of community resources and reviewed those resources with him, including resources related to housing assistance. Ms. Moon likewise testified that she reviewed community resources with Father while assisting him with matters of "parenting, house management, money management, and using community resources." Ms. Moon acknowledged that the parents, particularly Father, made some progress, including reducing their canine population and improving general cleanliness in the house itself. She stressed, however, that an environmental hazard remained due to the "bags and bags of garbage in the back." According to Ms. Moon, the parents had called the city waste service requesting a refuse container but had not pursued obtaining one when they discovered that a fee was involved. Ms. Moon stated that she worked with the parents utilizing community resources because initially they had trouble purchasing necessary groceries and paying their bills. She also reported that Father tested positive for marijuana use when she administered a hair follicle drug screen. Overall, Ms. Moon testified that Father was cooperative to an extent but did not put forth enough effort. The trial court in its final judgment clearly found Ms. Moon's testimony credible in this regard. We emphasize that the trial court's determinations regarding witness credibility are afforded great weight on appeal. *See Jones,* 92 S.W.3d at 838.

Father's housing situation became less stable during the following year. In November 2011, Father entered into a lease with Mr. Vashi for the Walden Road Duplex. According to Mr. Vashi, Father paid rent for only two months before he stopped making payments. Father corroborated Mr. Vashi's testimony that the Walden Road Duplex was left in a "nasty" state when vacated. Mr. Vashi stated that he had to replace carpet, flooring, and appliances and that the home was replete with pet waste and rotting food. Father stated that he had attempted to keep the home clean and did not know why it was in such disarray the month after he claimed to have vacated the premises, leaving Mother

21

still living there. After Father vacated the Walden Road Duplex in February or March 2012, he resided with a friend and her four children for several months in a housing situation that Father admitted was not suitable for the Child. Ms. Ash testified that when she attempted to visit Father at this home, she was unable to exit her vehicle due to large dogs, "like Rottweilers," in the front yard. She further stated that Father suggested she not visit the home but wait until he could establish new housing. In June 2012, while Father was apparently between these two housing situations, he told Ms. Morse that he was traveling to Florida for employment. According to Ms. Morse, Father provided no further details of his whereabouts in Florida. He then missed the June 5, 2012 permanency hearing.

Father subsequently began residing with Paternal Grandmother. He asserts that by the time of trial, he had established a suitable home for the Child with Paternal Grandmother. However, in its order denying Paternal Grandmother's petition for custody of the Child, the trial court found, *inter alia*, that there were "significant practical concerns regarding the residence . . . ." Paternal Grandmother testified that she had rented her home, a two-bedroom trailer, for approximately eleven years at the time of trial. Although Paternal Grandmother assured the court that she would follow any order to restrict Father's access to the Child if she were granted custody, she also testified that if the Child were to live in her home with Father, the two could either share a bedroom or Father could sleep in the living room. Ms. Wiltshire acknowledged that apart from the small size of Paternal Grandmother's home, DCS had initially determined the home to be appropriate for the Child's weekend visits during the first few months following the Child's removal into protective custody. Father admitted, however, that his name was not on Paternal Grandmother's lease. He testified that he was seeking another housing situation for himself, Paternal Grandmother, and, potentially, the Child. We determine that the evidence does not preponderate against the trial court's finding by clear and convincing evidence that Father had failed to establish a suitable home for the Child during both the determinative period and the nearly four years that followed prior to trial.

Father also argues that the trial court erred by finding clear and convincing evidence that DCS had provided reasonable efforts to assist him in establishing a suitable home. He acknowledges that through DCS's referral, Ms. Moon assisted him beyond the timeframe of the determinative period. He argues, however, that DCS should have continued to provide reasonable efforts despite the court's finding of severe abuse at the December 2011 adjudicatory hearing. He maintains that because he appealed the severe abuse finding to the Circuit Court, DCS should have continued to provide reasonable efforts to assist him. He points out that DCS filed the termination petition approximately three weeks following the Circuit Court's entry of the November 25, 2013 agreed order vacating the severe abuse finding as to Father.

22

In contrast to Father's argument, it is well settled in Tennessee that DCS is not required to exert reasonable efforts toward reunification upon a juvenile court's ruling of severe child abuse. *See* Tenn. Code Ann. § 37-1-166(g)(4)(A) (2014) (stating that under "aggravated circumstances" as defined in section 36-1-102, DCS is not required to make reasonable efforts toward reunification); Tenn. Code Ann. § 36-1-102(9) (including severe child abuse in the applicable definition of "aggravated circumstances"); *In re Kaliyah S.*, 455 S.W.3d 533, 553-54 (Tenn. 2015) ("[T]he aggravated-circumstances exception relieves DCS of this obligation [to make reasonable efforts] when a court of competent jurisdiction determines that aggravated circumstances, as defined in Section 36-1-102(a), are involved."); *In re C.M.M. & S.D.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326 at \*6 n.19 (Tenn. Ct. App. Mar. 9, 2004) (noting that severe child abuse is one of the aggravated circumstances in which DCS is not required to make reasonable efforts to reunite parents and children), *overruled on other grounds by In re Kaliyah S.*, 455 S.W.3d 533. We note also that our Supreme Court has held that "[T]he extent of the efforts made by the State is weighed in the court's best-interest analysis, but the State need not prove that it made reasonable efforts as an essential component of its petition to terminate parental rights." *In re Kaliyah S.*, 455 S.W.3d at 535.

In the instant action, the trial court relieved DCS of making reasonable efforts approximately six months following the end of the determinative period for this statutory ground. Moreover, Ms. Morse's and Ms. Ash's respective testimonies demonstrated that despite being relieved of the requirement to exert reasonable efforts to assist Father, DCS personnel continued to maintain contact and review permanency plan requirements with Father, including those related to establishment of a suitable home. We conclude that the trial court did not err in terminating Father's parental rights upon this statutory ground.

V. Substantial Noncompliance with Permanency Plans

The trial court also found clear and convincing evidence that Father failed to substantially comply with the reasonable responsibilities set out in his permanency plans. Tennessee Code Annotated § 36-1-113(g)(2) provides as an additional ground for termination of parental rights:

> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4[.]

In its final judgment, the trial court stated specific findings of fact regarding this statutory ground as follows:

The Court finds by clear and convincing evidence that [Father] has failed to comply in a substantial manner with his responsibilities under the permanency plan; that the Department provide[d] him with the permanency plan; and that the responsibilities therein were reasonably related to remedying the issues that brought the child into foster care and reasonably related to the goals. The Department has explained to [Father] those reasonable responsibilities, which are directly related and aimed at remedying the conditions, which necessitate foster care placement.

Specifically, [Father] failed to: (1) have stability, (2) maintain a child-proofed home, (3) pay child support, (4) have/maintain stable reliable income, (5) attend anger management classes, and (6) follow the recommendations of his parenting assessment. The recommendations of [Father's] parenting assessment (as are applicable to him) are as follows: (1) Keep a daily log with entries indicating what has been done every day to complete the permanency plan, (2) Obtain an occupational therapy consult and training to allow for training in carrying and transferring the child in a safe manner, (3) Submit to a drug challenge test consisting of ten (10) random drug screens in sixty days with two back-to-back tests administered in that time frame, (4) Obtain training in auditory stimulation activities for the child, (5) Attend a nurturing parenting course where baby-play activities can be modeled, (6) Obtain short-term goal-oriented psychotherapy to recognize and understand his early attachment and its relationship to his parenting style, (7) Develop a healthy outside social support system, (8) Obtain a psychiatric consult to establish if his symptom picture is more pervasive and to determine the need for possible use of psychotropic medication, (9) Acquire and maintain appropriate housing for a minimum of three months and provide DCS the right to visit the home whenever DCS deems appropriate, as well as safely and hygienically maintain pets.

[Father] testified that he knew his responsibilities under the permanency plans developed for him. [Father] was familiar with all the tasks outlined in the permanency plans for him. DCS [case managers] Elizabeth Wiltshire, Kim Ash, and Paige Morse all testified that they had gone over the permanency plans with [Father] and that [Father] never indicated that he did not understand the requirements. Ms. Wil[t]shire testified that she provided bus passes for [Father] because [Father] indicated that he had transportation issues. Ms. Wiltshire testified that she put Pathfinders services in [Father's] home to assist him with parenting

24

skills, money management issues, housekeeping issues, and utilizing community resources.

June Moon with Pathfinders testified that she went over the permanency plan with [Father] when she was working with the family. Ms. Moon indicated that she tried to help [Father] by providing services and guidance with the aim of helping [Father] complete the tasks on his permanency plan. Despite working with [Father] for six to seven (6-7) months, Ms. Moon testified that [Father's] progress was minimal and that his effort was lacking.

[Father] failed to submit any documentation that he completed any of the tasks on his permanency plan, with the exception of completing the parenting assessment. In the Order dated January 9, 2014, [Father] admitted that the only task he had completed on his permanency plan up to that date was a parenting class. However, he has submitted no proof that he completed that task.

The Court finds that [Father] understood the requirements of his permanency plan and made no substantial gain in completing his tasks since the child came into custody on November 4, 2010. The Department was relieved of making reasonable efforts to reunify the child with [Father] in the Adjudicatory Order dated December 21, 2011.

Upon careful review, we determine that a preponderance of the evidence supports the trial court's findings that Father failed to substantially comply with the reasonable responsibilities of his permanency plans.

Father does not dispute the trial court's finding that the only responsibility for which he presented documentation of completion was the parenting assessment. Father also testified that he had completed a parenting class, completed all but four sessions of an anger management class, and developed some friends as "social support." Father presented no witnesses corroborating his testimony regarding a social support system. Father also argues that he complied with the requirement of providing a stable home. Inasmuch as we have previously determined that Father failed to provide a suitable home for the Child, his argument that he completed the responsibility of providing a stable home is unavailing. Apart from these steps Father asserts he took toward completion of his responsibilities, Father's contention that the trial court erred by finding clear and convincing evidence of this statutory ground is based on his arguments that (1) DCS failed to provide notice to him through a statement of responsibilities pursuant to Tennessee Code Annotated § 37-2-403(a)(2)(A); (2) the permanency plan requirements

derived from the parenting assessment were not reasonably related to remedying the issues that brought the Child into protective custody, and (3) DCS failed to provide reasonable efforts to assist Father in complying with the permanency plan while his appeal of the severe abuse finding was pending. We will address each of Father's arguments in turn.

A. Notice of Statement of Responsibilities

DCS acknowledges that none of the five permanency plans included a separate "Statement of Responsibilities" with Father's requirements under the plan delineated in a listed format. DCS maintains, however, that such a separate statement is not a statutory requirement, provided that the parent's responsibilities are clear from the body of the permanency plan. We agree with DCS on this issue. Tennessee Code Annotated § 37-2-403(a)(2)(A) provides in relevant part:

> The permanency plan for any child in foster care shall include a statement of responsibilities between the parents, the agency and the caseworker of such agency. Such statements shall include the responsibilities of each party in specific terms and shall be reasonably related to the achievement of the goal specified in subdivision (a)(1).

As this Court has recently explained, "The absence of a more detailed statement of responsibilities in a permanency plan, while regrettable, is not necessarily fatal to reviewing a finding of substantial noncompliance with the statement of responsibilities in a permanency plan." *In re Zoey F.*, No. E2013-02603-COA-R3-PT, 2014 WL 2466328 at *10 (Tenn. Ct. App. May 30, 2014). Father relies on *In re Abigail F.K.*, No. E2012-00016-COA-R3-JV, 2012 WL 4038526 (Tenn. Ct. App. Sept. 14, 2012), in which this Court stated:

> If the parent is required to comply with the permanency plan, then the permanency plan should clearly communicate to the parent: this is what you must do to regain custody of your child. That is the purpose of the parent's statement of responsibilities. Thus, the absence of a clearly marked "statement of responsibilities" for Mother in the permanency plan is a significant problem.
>
> It is difficult for the Court to find that Mother failed to substantially comply with the plan's statement of responsibilities if the plan does not contain one.

*In re Abigail F.K.*, 2012 WL 4038526 at *13. In *In re Abigail F.K.*, however, this Court went on to consider whether the mother had substantially complied with the requirements of the permanency plan upon determining that, with one exception, "there [was] no dispute on appeal about what most of Mother's responsibilities were under the plan." *See id.*; *see also In re Zoey F.*, 2014 WL 2466328 at *9-10 (analyzing the father's responsibilities under the permanency plans despite the absence of separate, detailed statements of responsibilities when the father testified to his understanding of his responsibilities and participated in the process of developing multiple permanency plans).

In the case at bar, the permanency plans reflect that Father actively participated in the development of the first, second, third, and fifth plans. The fourth plan bears no signatures of participants. Father testified that DCS provided him with copies of the permanency plans and that he had read them. He stated that he understood his requirements under the first plan to be that he had to obtain stable housing, "steady income," and complete parenting classes. Although it is not clear whether Father participated in the development of the fourth permanency plan at which the recommendations of Mr. Mickulick's parenting assessment were incorporated, Father acknowledged that he understood the parenting assessment recommendations to be included in his responsibilities. Father also acknowledged that Mr. Mickulick provided him with a copy of the parenting assessment, which Father stated he had read and "agreed to most parts . . . ."

When questioned regarding what the fifth permanency plan, developed on August 14, 2013, required him to complete, he stated:

> Well, there was anger management classes, which it was put on and took back off and then put back on. The parenting classes stayed on there. Of course, I already completed them. Something about physical therapy on my wrist and some mental evaluation possible, medication if needed, drug and alcohol evaluation, keep stable housing and steady income. I believe that was it.

Father testified that he did not understand how to complete certain requirements, stating specifically that he did not know how to access an occupational therapist for training in how to safely transfer the Child and that he did not agree with the requirement that he seek to understand the causes of the Child's spiral fracture. Father stated that he believed he had completed the parenting assessment recommendation of psychotherapy to understand his own early attachment style when he had answered questions regarding his attachment style asked by Mr. Mickulick. Father also acknowledged, however, that he had not asked questions of the DCS case managers or his own attorney regarding how to

complete the requirements he did not fully understand.  We note that Father was represented by counsel at all times during these proceedings.

The trial court, in remarks made at the close of trial, addressed whether Father had been provided with a statement of responsibilities, finding that "while there is no separate document stated, titled, or styled statement of responsibilities that I know of or that's been presented . . . [Father] understood the plan."  Upon our thorough review of the record, we agree with the trial court.  Father's testimony demonstrated that he was aware of the full list of responsibilities in the permanency plans, including those responsibilities he questioned or for which he claimed to be unsure of the available resources.  We therefore determine that Father was provided with sufficient notice of his responsibilities under the permanency plans.

## B.  Parenting Assessment Recommendations

Father asserts that the trial court erred by finding the parenting assessment recommendations, incorporated into the fourth and fifth permanency plans as Father's responsibilities, to be reasonably related to remedying the causes of the Child's removal from Father's care.  He does not dispute the court's finding that Father completed none of the requirements derived from the parenting assessment, except to note that Father claimed at trial to have developed friends who comprised a social support system.  Father maintains that the "unfinished requirements" were "clearly aimed at addressing severe abuse" and "are not necessary for a plan addressing dependency and neglect."  We disagree.

As Father notes, the Circuit Court's agreed order vacating the trial court's prior severe abuse finding was entered subsequent to the development and ratification of the fifth and final permanency plan.  Father maintains that upon entry of this agreed order, the permanency plan should have been revised to eliminate the requirements derived from the parenting assessment.  Having reviewed the parenting assessment, which was submitted as an exhibit at trial, we find no such singular focus on the severe child abuse allegation.[5]  The assessor, Mr. Mickulick, reported that he administered the assessment over six months' time in 2011 by, *inter alia*, individually interviewing each of the parents and observing the Child on several occasions.  In his introduction to the assessment, Mr. Mickulick explained the assessment's purpose as follows:

---

[5] Upon Father's motion, the trial court granted funds for Father to call Mr. Mickulick as an expert witness.  On January 5, 2015, the final day of trial, Father's counsel explained that Mr. Mickulick was unavailable that day and that counsel might need to call Mr. Mickulick on an additional day of trial.  The court left the matter open for Father's counsel to raise at the close of the January 5, 2015 hearing if counsel deemed it necessary to call Mr. Mickulick.  Father's counsel did not raise the matter again.

28

The intention of this assessment was to gather data that would allow for parental recommendation to be made. These recommendations, if followed and completed, would hopefully enrich the quality of life for [the Child] and lay the foundation for his return home. Also, an opinion was sought as to the attachment of [the Child] to the biological parents. This holistic approach to the parental assessment not only examined the parents but the child as well in relation to his parents.

Other than a notation that the parents' veracity had been challenged during DCS's investigation of the case, Mr. Mickulick focused the assessment on interviews, observations, and procedures he administered. In introducing his recommendations within the conclusion of the assessment, Mr. Mickulick summarized:

These recommendations are idealistic, however without illusion. My initial impressions of the bio parents have changed over time. Initially, I viewed them to be motivated to work toward the return of their child. They have not been as productive as I hoped. Presently, the biological parents have a 50/50 chance at success over the next several months if their full attention and focus is directed at having their son returned to their care. If the recommendations are followed through on in a committed and insightful manner, a pattern of clear and convincing behavior will be manifested. This emerging behavior will indicate the willingness to offer *good enough* or reasonable *parenting*.

(Internal citation omitted; emphasis in original.)

The trial court expressly found Father's responsibilities under the permanency plans, including those derived from the parenting assessment, to be "reasonably related to remedying the issues that brought the child into foster care and reasonably related to the goals." As to Father's argument, we find no indication that the responsibilities of keeping a daily log of actions taken toward completion of the permanency plan; obtaining a consultation with an occupational therapist and occupational training to facilitate safe carrying and transfer of the Child with Father's medical condition; submitting to a drug challenge test; obtaining training in auditory stimulation activities for the Child; attending a nurturing parenting course with baby-play activities modeled; obtaining short-term, goal-oriented psychotherapy to understand Father's early attachment style; developing a healthy outside social support system; obtaining a psychiatric consultation to determine if psychotropic medication were needed; acquiring and maintaining appropriate housing for a minimum of three months; providing DCS the right to enter the home; and safely and hygienically maintaining pets were solely based upon the finding of severe abuse. To the contrary, we determine that these requirements were reasonably related to parenting skills

29

that Father needed to demonstrate in order to remedy the court's concerns for the Child's stability, safety, and environment that were raised upon DCS's investigation of the circumstances underlying the Child's injury and removal into protective custody. The evidence does not preponderate against the trial court's finding in this regard.

## C. Reasonable Efforts by DCS

Father also argues that once the trial court made the finding of severe abuse at the December 2011 adjudicatory hearing, DCS failed to provide further reasonable efforts to assist him in substantially complying with the permanency plans. In its orders ratifying the first two permanency plans, the trial court expressly found that DCS had exerted reasonable efforts toward the goal of reunifying the Child with the parents. The court made a similar finding in its orders ratifying the three subsequent permanency plans, all developed subsequent to entry of the adjudicatory order. However, in its orders ratifying the third and fourth plans, the court noted that "[t]he Department was relieved of making reasonable efforts to reunify the child with [Father] and/or [Mother] by order dated December 21, 2011." As we have explained in a previous section of this opinion, DCS is not required to exert reasonable efforts toward reunification when a court of competent jurisdiction finds the aggravating circumstance of severe child abuse. *See* Tenn. Code Ann. § 37-1-166(g)(4)(A); *In re Kaliyah S.*, 455 S.W.3d at 553-54. Moreover, "the State need not prove that it made reasonable efforts as an essential component of its petition to terminate parental rights." *In re Kaliyah S.*, 455 S.W.3d at 535.

Subsequent to entry of the trial court's order adjudicating the Child dependent and neglected, DCS was operating under the court's order relieving the department of making reasonable efforts to assist the parents. Father argues specifically that DCS provided no assistance when he requested that information be supplied to Joe Johnson Mental Health Center in Chattanooga ("Joe Johnson") regarding the purpose of counseling needed to complete permanency plan requirements. In this regard, Ms. Ash testified that while she was serving as an interim case manager in the late summer of 2012, Father told her that Joe Johnson needed something regarding treatment goals from DCS. According to Ms. Ash, she left messages at Joe Johnson but did not receive a return call. She subsequently returned the case to Ms. Morse, the primary case manager from January 2012 through the time of trial. Ms. Morse testified that Father told her his "psychiatric assessor" needed something from DCS clarifying Father's goals. Ms. Morse stated:

> And several different times, and once in the presence of his attorney, I explained to him that his parenting assessment itself contained what the Department is looking for and the concerns. I asked him if he had a copy of it and he said he did. And I said, you can present this to this person [assessor] that you find.

30

The case managers' respective testimonies demonstrate that despite being relieved of making reasonable efforts to assist Father by the adjudicatory order, they nonetheless continued to maintain contact and review permanency plan requirements with him.

Father maintains that upon the Circuit Court's order two years following the adjudicatory hearing, the trial court should have required DCS to develop a new permanency plan for Father, streamline Father's responsibilities, and again provide assistance to facilitate Father's substantial compliance with the plan. We disagree. The evidence demonstrates that Father's responsibilities under the permanency plans were reasonably related to remedying the conditions that necessitated the Child's removal into protective custody; Father failed to substantially comply with his requirements under the permanency plans; and the Child's chances, after four and one-half years in foster care, of integration into a safe, stable, and permanent home would have been greatly diminished by further continuation of the parent-child relationship. We conclude that the trial court properly terminated Father's parental rights based on clear and convincing evidence of this statutory ground.

VI. Best Interest of the Child

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005); *see also In re Carrington H.*, ___ S.W.3d at ___, 2016 WL 819593 at *11 ("'The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination.'") (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010)). Tennessee Code Annotated § 36-1-113(i) (Supp. 2015) provides a list of factors the trial court is to consider when determining if termination of parental rights is in the child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, ___ S.W.3d at ___, 2016 WL 819593 at *11; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

At the conclusion of trial, the trial court considered a recommendation from the guardian *ad litem* that it would be in the Child's best interest to terminate Father's parental rights.[6] The court subsequently analyzed the best interest factors, specifying in its final judgment the following findings of fact in relevant part:

> [Father] failed to make any adjustment of circumstance, conduct or conditions to make it safe and in the child's best interest to be placed in the care of said [Father]. [Father] failed to substantially complete any task on his permanency plan other than a parenting assessment, and did not follow the recommendations of that parenting assessment.

> [Father] failed to make a lasting correction of his circumstances after the state has tried to help him, and it doesn't appear that lasting change is likely.

> There is no meaningful relationship between [Father] and the child.

> A change of caretakers and home is likely to have a highly negative effect on the child. The child is bonded with his foster family, who wish to adopt the child. The foster family has had the child since the child came into custody on November 4, 2010. The child sees the foster family as his own family and calls them "Mommy," "Daddy," and "Brother." The child is happy and well-adjusted. The foster family and child have a large support network. The child is thriving in his foster home.

> [Father] has not paid child support consistent with child support guidelines.

The trial court therefore concluded by clear and convincing evidence that it was in the Child's best interest to terminate Father's parental rights. Upon careful review, we agree with this conclusion.

Father argues that the trial court erred in its analysis of the statutory best interest factors by finding that (1) DCS had provided reasonable efforts to assist him in effecting a lasting adjustment in his circumstances (factors one and two), (2) no meaningful relationship remained between Father and the Child (factor four), and (3) a change of caretakers and physical environment was likely to have a negative effect on the Child's condition (factor five). *See* Tenn. Code Ann. § 36-1-113(i). We will address each of these arguments in turn.

---

[6] The guardian *ad litem* filed a Notice of Joinder with this Court, pursuant to Tennessee Rule of Appellate Procedure 27(j), stating that she joins in and adopts by reference DCS's responsive brief in its entirety.

First, Father's contention that the trial court should have weighed a lack of reasonable efforts on DCS's part in favor of preserving his parental rights is primarily based on his argument that DCS should have extended additional efforts to assist Father after the Circuit Court vacated the severe abuse finding in November 2013. *See* Tenn. Code Ann. § 36-1-113(i)(2); *In re Kaliyah S.*, 455 at 556 ("DCS's lack of reasonable efforts may weigh heavily enough to persuade the trial court that termination of the parent's rights is not in the best interest of the subject child."). Having previously determined that the evidence does not preponderate against the trial court's finding that Father failed to substantially comply with the permanency plans despite DCS's having made reasonable efforts to assist him, we further determine this argument to be unavailing.

Second, Father asserts that the trial court erred by finding that, by the time of trial, no meaningful relationship existed between Father and the Child. *See* Tenn. Code Ann. § 36-1-113(i)(4). In support of his argument, Father cites Ms. Wiltshire's testimony that he was "hands-on" with the Child and cared for the Child appropriately during visits occurring within the first year that the Child was in protective custody. Indeed, Ms. Wiltshire, Ms. Morse, Ms. Moon, and E.S. (the foster mother) all testified, respectively, that when they observed visits, Father behaved appropriately toward the Child. However, it is undisputed that Father had not visited with the Child since his visitation was suspended in June 2012 when the Child was two years old. By the time of trial, Father had not visited the four-year-old Child in two and one-half years. E.S. testified that she did not know if the Child would recognize Father. We conclude that the evidence does not preponderate against the trial court's finding regarding this factor.

Third, Father contends that the evidence does not support the trial court's finding that a change of caretakers and physical environment would be likely to have a negative effect on the child's emotional and psychological condition. In support of this argument, Father quotes E.S. as having opined that the Child could be successfully reintroduced to his birth family after a long absence. The testimony to which Father refers occurred within the context of the portion of trial devoted primarily to the rehearing of Paternal Grandmother's petition for custody. Upon agreement of the parties, the trial court simultaneously heard testimony related to both Paternal Grandmother's petition and the termination petition. On cross-examination by Father's counsel, the following exchange ensued:

Father's Counsel: [I]f [the Child] were able to learn about his grandmother, you believe he could adapt to knowing who his grandmother is?

| E.S.: | He's four. I mean, as much as kids understand grandma at four, yeah. |
|---|---|
| Father's Counsel: | Right. But you don't think an interaction with his grandmother would be traumatic for [the Child]? |
| E.S.: | An interaction, no. I mean, I think at this point, he would want somebody else there with him that he knew with him. You know, to be left with somebody that he really doesn't know, I think would be a little scary for a four-year-old. |
| Father's Counsel: | But if he were reintroduced to her, he would not have a problem adapting, in your opinion, to her? |
| E.S.: | In my opinion, I think kids can be reintroduced. |

When subsequently questioned regarding whether she believed the Child would be able to build a new support community if he had to do so, E.S. replied: "It would make me sad for him, but yeah, I think kids can." E.S. had testified to the Child's positive disposition, intelligence, and capacity to learn. At no time did E.S. opine that a change of caretakers and physical environment would have no negative effect on the Child. On the contrary, E.S. testified that she and her husband were closely bonded to the Child and hoped to adopt him. By all accounts, the Child was thriving in his foster home. According to E.S., the Child was involved in many activities, including playing with the foster parents' six-year-old son, visiting educational attractions such as museums and aquariums, singing along when E.S. played the violin, and beginning to play the cello himself.

In denying Paternal Grandmother's custody petition at the close of the first day of trial on November 5, 2014, the trial court noted that Paternal Grandmother had testified that she believed the Child would adjust if brought into the home she shared with Father. The court stated in pertinent part:

> I don't think a four-year-old is quite as resilient as you [Paternal Grandmother] indicated you did today in your testimony. I think there are some valid emotional concerns with uprooting or changing custody from a foster parent to someone else, even a relative under these circumstances where there has been so little contact for so long and the child has been in the same stable placement for about four years or maybe actually the testimony today exactly four years today.

35

Upon our careful review, we determine that the evidence does not preponderate against the trial court's finding that a change in caretakers and physical environment was likely to have a negative effect on the Child.[7]

In addition, the remaining statutory factors cannot be said to weigh in favor of preserving Father's parental rights to the Child. Father's visitation with the Child had been suspended in June 2012 upon the Guardian *ad litem*'s motion (factor three); Father had been adjudicated neglectful toward the Child (factor six); Father was residing with Paternal Grandmother in a two-bedroom trailer with which the court previously had found "significant practical concerns" (factor seven); and Father had made only one $20 child support payment in over four years despite having been briefly employed (factor nine). *See* Tenn. Code Ann. § 36-1-113(i). Upon a careful and thorough review of the record, we conclude that clear and convincing evidence exists that termination of Father's parental rights was in the Child's best interest.

## VII. Conclusion

The decision of the trial court is affirmed in part and reversed in part. We reverse the trial court's finding of clear and convincing evidence of the statutory ground of abandonment through willful failure to provide financial support for the Child. We affirm the trial court's judgment in all other respects, including the termination of Father's parental rights to the Child. Costs on appeal are assessed equally to the appellant, Brent H., and the appellee, the State of Tennessee, Department of Children's Services. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating parental rights and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE

---

[7] We are not persuaded by Father's additional argument that the evidence was insufficient to support the trial court's best-interest finding because none of the DCS case managers expressly stated that it would be in the Child's best interest to terminate Father's parental rights. Father offers no authority, and we certainly find none, to indicate that such testimony is required.